Gregory G. Gordon (State Bar No. 5334)
ggordon@gordonlvlaw.com
**Gregory Gordon Law, P.C.**
4795 South Durango Drive
Las Vegas, Nevada 89147
Telephone: (702) 363-1072

Richard D. McCune (California State Bar No. 132124)*
rdm@mccunewright.com
David C. Wright (California State Bar No. 177468)*
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Emily J. Kirk (Illinois State Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116
Facsimile: (618) 307-6161

* *Pro Hac Vice* Applications will be submitted
within 14 days in compliance with LR 1A 11-2

*Attorneys for Plaintiff Linda Schmidt Skogmo
and the Putative Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LINDA SCHMIDT SKOGMO, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREATER NEVADA CREDIT UNION, and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.: 3:21-cv-384<br><br>**COMPLAINT FOR:**<br><br>1. Violation of the Electronic Fund Transfer Act (Regulation E, 12 C.F.R. §§ 1005, *et seq.*)<br>2. Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*)<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Class Action Complaint

## CLASS ACTION COMPLAINT

1.      Plaintiff Linda Schmidt Skogmo hereby brings this lawsuit against Greater Nevada Credit Union ("GNCU") on behalf of GNCU's members, on the basis that GNCU has violated Federal Reserve Regulation E, 12 C.F.R. § 1005.1, et seq. Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must (1) provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); (2) provide that disclosure as a stand-alone document not intertwined with other disclosures; and (3) obtain verifiable affirmative consent of a customer's agreement to opt into the financial institution's overdraft program.

2.      In order to comply with Regulation E, GNCU must provide members with a Regulation E opt-in disclosure agreement that accurately and simply describes its overdraft program and services. But GNCU does not provide its members, including Plaintiff, with an accurate and/or easily understandable Regulation E opt-in disclosure agreement describing the circumstances or conditions in which GNCU charges overdraft fees.

3.      Because Regulation E does not permit financial institutions to charge overdraft fees until they obtain affirmative consent from customers through an accurate disclosure of their overdraft practices in a stand-alone opt-in disclosure agreement, GNCU's assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal. Further, GNCU's continued use of a non-conforming disclosure agreement to "opt-in" new members to its overdraft service is invalid.

4.      Regulation E provides a cause of action against financial institutions that fail to abide by its requirements. GNCU's violations are also actionable under the Nevada Deceptive Trade Practices Act. *See* Nev. Rev. Stat. § 598.0903 *et seq*. Pursuant to the Nevada Deceptive Trade Practices Act, Plaintiff also seeks to enjoin GNCU from continuing to obtain new members' "consent" to be assessed overdraft fees by using an opt-in disclosure agreement that violates Regulation E, and from continuing to assess overdraft fees on Regulation E transactions

until it obtains the consent of current members using a Regulation E-compliant disclosure agreement. *See* Nev. Rev. Stat. § 598A.210.

## I     NATURE OF THE ACTION

5.     All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel (unless otherwise stated). Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation. Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

6.     Plaintiff has brought this class and representative action to assert claims in his own right and as the class representative of all other persons similarly situated. Regulation E requires GNCU to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions. Because of the substantial harm caused by large overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all mandated overdraft information in one clear and easily understood document. Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with account holders regarding the institution's overdraft policies.

7.     GNCU does not meet these requirements. It does not provide its members with a compliant stand-alone Regulation E opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe its overdraft services including, but not limited to, failing to state or clearly describe its overdraft procedures within the four corners of the opt-in agreement. It also fails to include all of the information mandated by Regulation E, and includes additional information not permitted. Furthermore, the opt-in disclosure agreement

Class Action Complaint

uses inconsistent terminology to describe GNCU's overdraft services and misrepresents and/or promotes the overdrafts services in a misleading manner.

8.      In its opt-in disclosure agreement, GNCU explains that it will pay overdrafts for those members that opt into its overdraft program ("Overdraft Protection") and do "not have enough money in [his or her] account to cover a transaction." When the overdraft is covered, GNCU charges the member a $35 fee.[1] But GNCU's opt-in disclosure agreement inaccurately discloses what it means for a member to "not have enough money" in the account. Regulation E requires GNCU to clearly and unambiguously disclose how it calculates overdrafts, and under what conditions it charges overdraft fees as part of its overdraft program.

9.      GNCU's failure to use an opt-in disclosure agreement substantially similar to the Model A-9 form, its failure to present all of the required information about its overdraft services, and its use of inconsistent terms to describe its overdraft service, all show fundamental disregard for Regulation E's basic purpose of protecting consumers by ensuring that all of their overdraft service options are disclosed so they can make an informed decision when deciding whether or not to opt into overdraft coverage for Regulation E-covered transactions.

10.     Plaintiff has been harmed by GNCU's violations of these regulations. On information and belief, Plaintiff was opted in to GNCU's overdraft program using an improper disclosure agreement that failed to adequately describe, and misrepresented to members, GNCU's overdraft practices. Further, Plaintiff has been assessed overdraft fees on transactions that were not permitted because GNCU obtained Plaintiff's "consent" using the non-compliant agreement. This action seeks statutory damages, restitution, and injunctive relief due to, *inter alia*, GNCU's policy and practice of obtaining "affirmative consent" using a noncompliant opt-in disclosure agreement while improperly advertising and marketing its overdraft services.

## II      PARTIES

11.     Plaintiff Linda Schmidt Skogmo is a resident of Gardnerville, Nevada, and a GNCU member at all relevant times to this Complaint.

---

[1] https://www.gncu.org/Resources/Banking/Overdraft-Protection (last visited on Aug. 26, 2021).

Class Action Complaint

12.     Based on information and belief, GNCU is a credit union with its headquarters and principal place of business in Carson City, Nevada. GNCU maintains several branches throughout northern Nevada.

13.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

14.     Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

15.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

16.     At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants. However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

17.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

-4-

18.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

### III     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 under the Class Action Fairness Act of 2005 because: (i) there are 100 or more Class Members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different States. This Court also has federal question subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this District because GNCU maintains its headquarters in this District, transacts business in this District, and GNCU executed the unlawful policies and practices which are the subject of this action in this District.

### IV     BACKGROUND

**A.    Defendant GNCU**

21.     GNCU is a credit union headquartered in Carson City, Nevada, with branches in several cities across northern Nevada. As of December 31, 2020, according to its financial filings, it reported having over 78,000 members and holding over $1.3 billion in assets. GNCU reported that in 2020 it collected approximately $15 million in fee income, of which overdraft fees are believed to constitute a significant percentage.

22.     One of GNCU's main services is a "share deposit" account.[2] A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines. Debits decreasing the amount in a checking account also can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic

---

[2] This is a credit union's formal nomenclature for what is more commonly known as a "checking" account at banks.

Class Action Complaint

purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

23.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), GNCU assesses overdraft fees (a fee for paying an overdrawn item) and NSF fees (a fee for a declined, unpaid returned item) to its members' accounts when it claims to have determined that an account has been overdrawn.

24.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the account holder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation. The fee GNCU charges here constitutes very expensive credit in the overdraft context that harms the poorest customers and creates substantial profit. According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[3]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small. In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, such a loan would carry a 17,000 percent annual percentage rate (APR).

---

[3] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Aug. 26, 2021).

Class Action Complaint

(Emphasis added.)[4]

25.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions. According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[5]

26.     GNCU's financial filings and practices reveal that it has followed these trends to the letter. GNCU charges an overdraft fee of $35 per item. But even if it had been properly charging overdraft fees, the $35 overdraft fee bears no relation to its minute risk of loss or cost for administering overdraft and non-sufficient funds services. But an overdraft fee's practical effect is to charge those who pay them an interest rate with an APR in the thousands. And on top of the original $35 overdraft fee, Greater Nevada assesses an additional $10 per day fee until the account is brought to a positive balance.

27.     Accordingly, overdraft fees are punitive fees rather than service fees, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee. A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[6] In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[7] More than 50% of those assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee, (*id*. at p. 10).

---

[4] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Aug. 26, 2021).
[5] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Aug. 26, 2021).
[6] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/-/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Aug. 26, 2021).
[7] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Aug. 26, 2021).

Class Action Complaint

28.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees. Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees. (*Id*. at p. 3.) A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old. (*Id*.) More than 50% of the customers assessed overdraft fees earned under $40,000 per year. (*Id*. at p. 4.) And non-whites are 83% more likely to pay an overdraft fee than whites. (*Id*. at p. 3.)

**B.    Regulation E**

29.     For many years, banks and credit unions have offered overdraft services to their account holders. Historically, the fees these services generated were relatively low, particularly when methods of payment were limited to cash, check, and credit card. But the rise of debit card transactions replacing cash for smaller transactions—especially for younger customers who carried lower balances—provided an opportunity for financial institutions to increase the number of transactions in a checking account that could potentially be considered overdraft transactions, and for which the financial institution could assess a hefty overdraft fee. The increase in these types of transactions was timed perfectly for financial institutions, which faced falling revenue as a result of lower overall interest rates and the rise of competitive innovations such as no-fee checking accounts. Financial institutions thus recognized in overdraft fees a new and increasing revenue stream.

30.     As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small. As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk. When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

31.     Using common understanding, an overdraft occurs when two conditions are satisfied. First, the consumer initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction. Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall. An

Class Action Complaint

overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the accountholder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[8] The financial institution uses its own money to pay the transaction, on the assumption that the account holder will eventually cover the shortfall.

32.    Before the Federal Reserve amended Regulation E regarding requirements for overdraft services, many financial institutions unilaterally adopted internal "overdraft payment" plans. Consumers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would cover the overdraft while charging the standard overdraft fee. Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning a $4 cup of coffee at Starbucks into a $40 cup of coffee.

33.    The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft programs. Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all. It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from account holders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions. After Regulation E's amendment, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee, or direct the transaction to be denied at the point of sale. Further, without the opt-in, the financial institution

---

[8] For a thorough description of the mechanics of an "overdraft," *see* https://www.investopedia.com/terms/o/overdraft.asp (last visited Aug. 26, 2021).

Class Action Complaint

could not charge an NSF fee because denying an ATM withdrawal or one-time debit card purchase meant no transaction had ever taken place, and thus there was no transaction to return.

34.    After the CFPB's creation, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs. Unsurprisingly, the CFPB found that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to account holders. The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225. The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."[9]

35.    Given the state of overdraft programs prior to Regulation E's amendment, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in an APR of thousands of percent interest (using averages—17,000% APR), all while assuming very little risk because only a very small percentage of overdraft customers fail to repay an overdraft.

---

[9] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

36.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts. It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document, segregated from other forms, disclosures, or contracts provided by the financial institution. It must also accurately disclose to the account holder the institution's overdraft charge policies. The account holder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 1005.4(a)(1). The financial institution must ultimately establish that the account holder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

37.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions. These include large banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank. However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals. As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

38.     But financial institutions did not stop with charging these exorbitant penalty fees. Instead, many of them began manipulating the process as to when they would consider a transaction an overdraft, because the more overdrafts they could create, the more their profits would increase. To that end, they charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but extended overdraft fees to transactions paid with their customers' own money. That is, the financial institution unilaterally decided the account was overdrawn not because of an actual lack of funds, but based on an artificial calculation involving the money in the account minus holds the financial institution unilaterally reserved for future payment at some future date.

Class Action Complaint

39.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account. "Actual balance," "ledger balance," "current balance" or even "balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time. In contrast, "available balance" is a term of art the financial industry uses to describe the balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[10] But absent further explanation introducing these concepts to consumers, terms like "available balance" have little or no meaning to reasonable consumers.

40.     Although financial institutions calculate the two balances, the actual/ledger/current balance of the money in the account is the official balance. It is used when financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer— the official record of the account.

41.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual account balance or the "available balance" for overdraft and NSF assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed. Whether the financial institution uses the actual money in the account or some other artificial balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

42.     Many financial institutions use the "available balance" for overdraft assessment purposes as it consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance. The actual balance includes all money in the account. On the other hand, the available balance always subtracts any holds placed on the funds in the account that may affect the money in the account in the future. It never adds

---

[10] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

Class Action Complaint

funds to the account. To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account. The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money. All of the accountholder's money remains in the account, even the money Defendant has defined as "held." The fact that the money has a "hold" on it does not mean it has been removed from the account.

43.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and account holders. Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%. What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer. At all times, the financial institution uses the customer's own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

44.     A hypothetical demonstrates what the financial institution does under these circumstances. Suppose that an individual has $1,000. The individual intends to use $800 of this amount to pay rent. The individual then intends to use the other $200 to make his monthly car payment. But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off. The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill. This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due. And if the individual does find the additional $40 before paying the car payment, there will never be a problem. If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill. He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

45.     The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account. Suppose the same individual put the $1,000 in

Class Action Complaint

his checking account under similar circumstances on the 27th of the month. That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month. The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee. He approves the water bill payment, and it posts immediately. Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account. All three payments are made with the individual's own account funds. The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive. However, even if the customer does not transfer the $40, it is only the car payment which posts last that is paid without sufficient money in the account to cover it. Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

46.    A financial institution using the "available balance" method of calculating overdrafts would come to a different conclusion. Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account. This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account. Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account. And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds. Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions. Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

-14-

47.     Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts *without clear disclosure of that practice* likely violates Reg E and other state laws. For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[11]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

> A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[12]

48.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood. As

---

[11] https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Aug. 26, 2021).
[12] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Aug. 26, 2021).

Class Action Complaint

the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated and explained in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions. Either inaccurately or ambiguously describing the use of which balance a financial institution uses as part of its overdraft practice violates the plain language of Regulation E.

## C.    GNCU's Regulation E Practices

49.    GNCU opts members into its overdraft program using an opt-in disclosure agreement that violates Regulation E. The opt-in disclosure agreement is inaccurate and/or unclear because, *inter alia*, it does not inform Plaintiff and putative class members about GNCU's method of assessing overdraft fees.

50.    In its opt-in disclosure agreement, GNCU explains that an overdraft occurs "when you do not have enough money in your account to cover a transaction." But GNCU fails to explain what it means for the member to not have "enough money" in the account. In fact, GNCU does charge overdraft fees even when there is enough money in the account to cover the transaction, which means that the opt-in disclosure agreement is not accurate.

51.    Many courts have already found that failing to clearly and accurately describe an overdraft program in an opt-in disclosure agreement constitutes a Regulation E violation.[13] By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, GNCU

---

[13] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6–8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program); *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

Class Action Complaint

failed to provide the clear and easily understandable description of its overdraft services that Regulation E demands.

52.    Institutions that use an account's "available" balance to calculate overdrafts disclose it in a far more clear and specific manner than GNCU. For example, Synovus Bank defines an overdraft as when there is not enough money in an account, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance. TD Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway. Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway. 'Available Balance' is your account balance less any holds placed on your account."

53.    Because GNCU failed to accurately, clearly, and in an easily understandable way disclose its overdraft policies, and it failed to provide its members with a Regulation E complaint opt-in disclosure agreement. Thus, it continues to charge Plaintiff and Class Members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E. Further, on information and belief, GNCU continues to "opt-in" new members to its overdraft program using the same improper opt-in disclosure agreement.

## V    FACTUAL ALLEGATIONS AGAINST DEFENDANT

54.    GNCU failed to define the terms "insufficient funds," "insufficient available funds," "funds not available," and "available balance" in the standard opt-in disclosure agreement it uses to enroll members in its overdraft program for one-time debit card and ATM transactions.

55.    At all relevant times, GNCU knew or should have known that in order to legally charge overdraft fees to members, it was required to first obtain affirmative consent from each

Class Action Complaint

member using a Regulation E compliant stand-alone opt-in disclosure agreement. Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language.

56.    At all relevant times, on information and belief, GNCU used nearly identical opt-in disclosure agreements to opt-in Plaintiff and all putative class members.

57.    Because GNCU uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices, GNCU has no legal basis on which to charge members overdraft fees on one-time debit card and ATM transactions, yet it does so anyway.

58.    At all relevant times, GNCU knew it was using a specific "available" balance methodology to assess overdraft fees, and further knew or should have known that its methodology should be clearly and accurately described in a stand-alone document. GNCU also knew or should have known that its opt-in disclosure agreement failed to provide an accurate, clear, and easily understandable definition of an overdraft.

59.    At all relevant times, GNCU knew or should have known that Regulation E requires an accurate disclosure of GNCU's overdraft services in a clear and conspicuous manner, and that it prohibited the use of inconsistent terminology to describe such terms.

60.    At all relevant times, GNCU misrepresented its overdraft program and promoted it inaccurately and/or in a misleading way.

61.    At all relevant times, GNCU charged Plaintiff and the putative class members overdraft fees on one-time debit card and ATM transactions even though it did not first obtain members' affirmative consent using a legal opt-in disclosure agreement.

62.    Based on information and belief, GNCU continues to opt members into its overdraft program using a non-compliant opt-in disclosure agreement, and then charges its members overdraft fees on certain one-time debit card and ATM transactions.

Class Action Complaint

63.    Based on information and belief, GNCU continues to charge existing members overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.[14]

## VI    PLAINTIFF'S HARM

64.    Plaintiff has held an account with GNCU at all times relevant to the allegations and is believed to be opted into its overdraft program for his debit card and ATM transactions.

65.    As will be established using GNCU's own records, Plaintiff has been assessed numerous improper fees on debit card and ATM transactions. On at least one occasion, Plaintiff was charged overdraft fees even when there was enough money in her account to cover her transaction.

66.    The extent of improper charges GNCU assessed upon Plaintiff and other members will be determined in discovery using GNCU's records.

67.    Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys. While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until 2021 because GNCU was creating confusion among its members by describing different practices in agreements and other materials it was disseminating to members. This not only reasonably delayed discovery, but GNCU's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop GNCU.

## VII    CLASS ACTION ALLEGATIONS

68.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

69.    Plaintiff brings this case, and each of the respective causes of action, as a class action.

---

[14] Because SPFCU does not make information about how it opts in its members publicly available, the complaint may be amended following discovery to include additional grounds for Plaintiff's Regulation E violations.

Class Action Complaint

70.    The "Class" is composed of:

**The Regulation E Class**:

> All GNCU members who have or have had accounts with GNCU who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

**The NDTPA Class**:

> All GNCU members who have or have had accounts with GNCU who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning four-years preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

71.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

72.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

73.    **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable. While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of members harmed by banks and credit unions with similar practices that the Class is likely to include thousands of GNCU members.

74.    Upon information and belief, GNCU has databases, and/or other documentation, of its members' transactions and account enrollment. These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been harmed by its practices and thus qualify as a Class Member. Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover. Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

75. **Commonality** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether GNCU opt-in disclosure agreement violates Regulation E because it does not accurately, clearly, and in an easily understandable way describe GNCU's overdraft program.

- Whether GNCU violated Regulation E by assessing overdraft fees on one-time debit card and ATM transactions against Class Members.

- Whether GNCU's conduct also violates the Nevada Deceptive Trade Practices Act

- Whether GNCU continues to violate Regulation E by opting in members and the public using its opt-in disclosure agreement and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on its opt-in disclosure agreement.

- Whether GNCU violated Regulation E by failing to opt members into its overdraft program by legal means, including properly publishing the opt-in form; obtaining and preserving members' written consent; and sending confirmation of members' decision to opt-in and instructions on how to opt out of the overdraft program.

76. **Typicality** – Plaintiff's claims are typical of all Class Members. The evidence and the legal theories regarding GNCU's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure agreement GNCU used to opt-in Plaintiff is the same as the opt-in disclosure agreement GNCU used to opt-in the other Class Members. Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions. Accordingly, Plaintiff will serve the interests of all Class Members.

77. **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection. There are

no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate. Plaintiff and counsel intend to prosecute this action vigorously.

78. **<u>Predominance and Superiority</u>** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for GNCU's wrongful conduct. Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing GNCU's violations of law to proceed without remedy and allowing GNCU to retain the proceeds of its ill-gotten gains.

79. Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from

activities that occurred largely therein. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

80.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members. Upon information and belief, GNCU's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

81.    This matter is properly maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other GNCU members not parties to the adjudication, or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; and

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

Class Action Complaint

82.     GNCU has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rules of Civil Procedure, Rule 23(b)(2). Moreover, on information and belief, Plaintiff alleges that GNCU's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue into the future if an injunction is not entered.

## FIRST CAUSE OF ACTION

### (Violation of Regulation E)

83.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

84.     By charging overdraft fees on ATM and non-recurring debit card transactions, GNCU violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b).

85.     Specifically, GNCU's conduct violated Regulation E's "Opt In Rule." *See* 12 C.F.R. § 1005.17. The Opt In Rule states: "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program. *Id*. (emphasis added). The notice "shall be clear and readily understandable." 12 C.F.R. § 1005.4(a)(1). To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account, nor can the financial institution influence a customer's decision to opt-in.

-24-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

86.    The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 59040, 59048, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

87.    GNCU failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against member accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions. GNCU has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide members an accurate and non-ambiguous description of the overdraft program that members can understand in a "clear and readily understandable way." Further, the opt-in disclosure agreement fails to include all of the Regulation E required disclosures and includes other prohibited information.

88.    As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, GNCU was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

89.    As the result of GNCU's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

Class Action Complaint

## SECOND CAUSE OF ACTION

### (Violation of Nevada Deceptive Trade Practices Act,

### Nev. Rev. Stat., §§ 598.0903, *et seq.*)

90.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.     GNCU's conduct described herein violates the Nevada Deceptive Trade Practices Act, codified at Nev. Rev. Stat. §§ 598.0903, *et seq*. The Nevada Deceptive Trade Practices Act prohibits, among other things, knowingly making a false representation in a transaction.

92.     As further alleged herein, GNCU's conduct violates the Nevada Deceptive Trade Practices Act insofar as GNCU charges overdraft or NSF fees in violation of Regulation E. GNCU's conduct was misleading and deceptive, with the purpose of convincing members to enroll in GNCU's lucrative overdraft program.

93.     As a result of GNCU's violations, Plaintiff and Class Members have paid improper overdraft fees and thereby have suffered actual loss of money. Absent injunctive relief forcing GNCU to disgorge itself of its ill-gotten gains and public injunctive relief prohibiting GNCU from misrepresenting and omitting material information concerning its overdraft policy at issue in this action in the future, Plaintiff, GNCU members, and the general public will suffer from and be exposed to GNCU's unlawful conduct.

### VIII    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Putative Class pray for judgment as follows:

      a.     for an order certifying this action as a class action;

      b.     for compensatory damages on all applicable claims and in an amount to be proven at trial;

      c.     for an order requiring GNCU to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

      d.     for statutory damages;

      e.     for civil penalties;

Class Action Complaint

f.      for an order enjoining the continued wrongful conduct alleged herein;

g.      for costs;

h.      for pre-judgment and post-judgment interest as provided by law;

i.      for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, the Nevada Deceptive Trade Practices Act, and all other applicable law; and

j.      for such other relief as the Court deems just and proper.

Dated: August 26, 2021                    Respectfully Submitted,

                                          */s/* Gregory G. Gordon
                                          Gregory J. Gordon
                                          ggordon@gordonlvlaw.com
                                          **Gregory Gordon Law, P.C.**
                                          4795 South Durango Drive
                                          Las Vegas, Nevada 89147
                                          Telephone: (702) 363-1072

                                          Richard D. McCune (State Bar No. 132124)*
                                          rdm@mccunewright.com
                                          David C. Wright (State Bar No. 177468)*
                                          dcw@mccunewright.com
                                          **MCCUNE WRIGHT AREVALO, LLP**
                                          3281 E. Guasti Road, Suite 100
                                          Ontario, California 91761
                                          Telephone: (909) 557-1250
                                          Facsimile: (909) 557 1275

                                          Emily J. Kirk (IL Bar No. 6275282)*
                                          ejk@mccunewright.com
                                          **McCUNE WRIGHT AREVALO, LLP**
                                          231 N. Main Street, Suite 20
                                          Edwardsville, IL 62025
                                          Telephone: (618) 307-6116
                                          Facsimile: (618) 307-6161

                                          Attorneys for Plaintiff Linda Schmidt Skogmo
                                          and the Putative Class

                                          * *Pro Hac Vice* Applications will be submitted
                                          within 14 days in compliance with LR 1A 11-2

-27-

1

## DEMAND FOR JURY TRIAL

2

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

3

4

Dated: August 26, 2021                           Respectfully Submitted,

5

/s/ Gregory G. Gordon

6

Gregory J. Gordon
ggordon@gordonlvlaw.com

7

**Gregory Gordon Law, P.C.**
4795 South Durango Drive

8

Las Vegas, Nevada 89147
Telephone: (702) 363-1072

9

Richard D. McCune (State Bar No. 132124)*

10

rdm@mccunewright.com
David C. Wright (State Bar No. 177468)*

11

dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**

12

3281 E. Guasti Road, Suite 100
Ontario, California 91761

13

Telephone: (909) 557-1250
Facsimile: (909) 557 1275

14

Emily J. Kirk (IL Bar No. 6275282)*

15

ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**

16

231 N. Main Street, Suite 20
Edwardsville, IL 62025

17

Telephone: (618) 307-6116
Facsimile: (618) 307-6161

18

Attorneys for Plaintiff Linda Schmidt Skogmo

19

and the Putative Class

20

*Pro Hac Vice Applications will be submitted
within 14 days in compliance with LR 1A 11-2

21

22

23

24

25

26

27

28

-28-